UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BENJAMIN SIMONS and ROBIN SIMONS,

                                        Plaintiffs,

                    vs                                          5:03-CV-706

THE STATE OF NEW YORK; TROOPER JOHN
J. FITZGERALD, in his individual and official
capacities; INVESTIGATOR GARY SHULTZ,
in his individual and official capacities; TROOPER
HOVEY, supervisor, in his individual and official
capacities; TROOPER JACK GRAHAM,
supervisor, in his individual and official capacities;
and the NEW YORK STATE POLICE,

                                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

A.J. BOSMAN, ESQ.
Attorney for Plaintiffs
258 Genesee Street
Suite 301
Utica, New York 13502

HON. ELIOT SPITZER                              DAVID B. ROBERTS, ESQ.
Attorney General of the State of New York
Attorneys for Defendants
The Capitol
Albany, New York 12224

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

        Plaintiffs Benjamin Simons ("Mr. Simons" or "plaintiff") and Robin Simons ("Mrs.

Simons") (collectively "plaintiffs") bring this action against defendants the State of New York

("the State"), the New York State Police ("the State Police"), and Trooper John J. Fitzgerald ("Trooper Fitzgerald"), Investigator Gary Shultz ("Investigator Schultz"),[1] Trooper Hovey ("Sergeant Hovey"),[2] and Trooper Jack Graham ("Senior Investigator Graham")[3] in their individual and official capacities (collectively "defendants").  Plaintiffs assert eight causes of action: first, false arrest in violation of 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution; second, malicious prosecution in violation of § 1983 and the Fourth Amendment; third, deprivation of substantive due process in violation of § 1983 and the Fourteenth Amendment to the United States Constitution; fourth and fifth, abuse of process in violation of § 1983 and the Fourteenth Amendment, and the New York State Constitution; sixth, failure to properly train and supervise in violation of § 1983; seventh, common law defamation; and eighth, common law loss of consortium.  Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), and to dismiss pursuant to Rule 12, subsections (b)(1) and (b)(6).  Plaintiffs oppose.  Oral argument was heard on November 6, 2006, in Utica, New York.  Decision was reserved.

## II.  FACTS[4]

Plaintiffs own a dairy farm in Steuben, New York.  On July 15, 2002, a New York State Department of Environmental Conservation ("DEC") official discovered a dead cow on

---

[1]  In the complaint, plaintiffs incorrectly spell Investigator Schultz's name as "Shultz"; the bulk of the evidence suggests that the correct spelling is "Schultz."

[2]  In the complaint, plaintiffs incorrectly refer to Hovey as a "Trooper"; Hovey is a Sergeant.

[3]  In the complaint, plaintiffs incorrectly refer to Graham as a "Trooper"; Graham is a Senior Investigator.

[4]  Unless otherwise indicated (by the preface "Plaintiffs claim . . ." or similar language), the following facts are not in dispute.

state-owned land adjacent to plaintiffs' farm.[5]  The cow, which was mostly black in color, was

chained to a tree and had a puncture wound in its right flank.  The DEC official informed Mr.

Simons of the discovery and asked him if he was missing a cow.  Plaintiff told him that he

was indeed missing a cow and accompanied the DEC official to the site.  Thereafter, plaintiff

contacted the State Police.  Trooper Fitzgerald, Investigator Schultz, and Sergeant Hovey

arrived at the scene and Investigator Schultz took control of the case.  Investigator Schultz,

suspecting animal cruelty, summoned a veterinarian and local media outlets in order to

publicize the matter.  Both Investigator Schultz and Mr. Simons spoke to members of the

local media at the scene.  The next day, plaintiff signed a written statement confirming that

he had been missing his "number 8" cow for several days and that the deceased cow was his

"number 8" cow.

Danielle Loranger, the wife of another local farmer named Brian Loranger ("Mr.

Loranger"), became aware of the incident and contacted Investigator Schultz.  She told him

that the dead cow belonged to her husband, not Mr. Simons.  On July 17, 2002, Mr. Loranger

signed a written statement attesting to the fact that he owned the dead cow and explaining

the circumstances surrounding its death and disposal.  According to his statement, Mr.

Loranger found the cow dead from natural causes, used a tractor-powered bailing spear to

scoop the carcass onto the bed of his truck (possibly puncturing its right flank in the process),

and drove it out to state land to dispose of it.  After arriving at the location, he tied one end of

a chain around the dead cow's neck and the other end to a tree.  He then drove off, leaving

the dead cow where it was later discovered.  In his statement, Mr. Loranger also indicated

---

[5]  Plaintiffs actually leased this land from the State.

that he didn't know Mr. Simons personally but that his grandparents raised him one summer, and that he heard Mr. Simons had drowned sick cows in the past to collect insurance money. Mr. Loranger did not attribute the statement regarding past insurance fraud to any particular person or otherwise provide the basis for such knowledge.

After speaking with Mr. Loranger, Investigator Schultz began to suspect that he and Mr. Simons were colluding to unlawfully obtain insurance money for the dead cow.  That same day, Trooper Fitzgerald was sent to plaintiffs' farm to collect proof of ownership of the dead cow.  When Trooper Fitzgerald arrived at plaintiffs' farm to obtain the requested documentation, Mr. Simons provided him with his "number 8" cow's milking records, as well its "Individual Cow History Record."  The latter record describes plaintiffs' "number 8" cow as "mostly white."  Trooper Fitzgerald secured these documents but neither he nor Investigator Schultz examined them until after July 18, 2002.  Mr. Simons signed another written statement indicating that he provided the above-mentioned documentation to Trooper Fitzgerald, and also that his "number 8" cow was pregnant and due to deliver in two months. While Trooper Fitzgerald was at plaintiffs' farm, Mr. Simons telephoned his insurance agent and attempted to submit a claim on the cow.  Plaintiffs claim that Mr. Simons telephoned his agent at Trooper Fitzgerald's urging; defendants claim that he did so of his own volition. Trooper Fitzgerald also spoke with the insurance agent and then left with the documents provided by plaintiff.

The next day, July 18, 2002, Trooper Fitzgerald and Investigator Schultz returned to plaintiffs' farm.  They arrived at the same time but in separate vehicles.  Investigator Schultz exited his vehicle and immediately confronted Mr. Simons.  Plaintiffs claim that Investigator Schultz got very close to Mr. Simons, with his face only several inches from his face.  He

then told Mr. Simons that he knew Mr. Simons knew the dead cow did not belong to him, but rather to Mr. Loranger.  Plaintiffs claim that Investigator Schultz was very emotional, his face red and veins protruding from his neck.  He told Mr. Simons that he had to go to the police barracks to discuss the matter further and directed him to get into Trooper Fitzgerald's patrol car.  Investigator Schultz then confronted plaintiffs' farmhand, Ernest Darvoe ("Mr. Darvoe").  When Mr. Darvoe told Investigator Schultz that the dead cow was plaintiffs' missing "number 8" cow, Investigator Schultz raised his voice and told him to stop lying or else he would be arrested for insurance fraud.  Both men were then taken to the police barracks for questioning.

Plaintiffs claim that during Investigator Schultz's questioning of Mr. Darvoe at the police barracks, he could be overheard forcefully urging Mr. Darvoe to tell him what he wanted to hear and to sign a statement he had prepared or else he would go to jail.  Mr. Darvoe eventually signed a written statement attesting to the fact, among others, that plaintiffs were not missing any cows and that Mr. Simons knew the dead cow did not belong to him.  Mr. Darvoe has since recanted these statements and says that he told Investigator Schultz those things because he thought it is what he wanted to hear.  After Mr. Darvoe signed the written statement, Investigator Schultz questioned Mr. Simons about his theory that he and Mr. Loranger were colluding to collect insurance money.  Plaintiff denied the allegations.  Sergeant Hovey was present at the police barracks during this time.

At some point, Mr. Simons contacted his wife and explained that Investigator Schultz informed him that the dead cow actually belonged to Mr. Loranger and that he was being accused of insurance fraud.  She then sent several farmhands out to search the property for the missing "number 8" cow.  After being questioned by Investigator Schultz, Mr.

Simons was formally placed under arrest and transported to his arraignment by Trooper Fitzgerald.  En route to his arraignment, Mrs. Simons called Mr. Simons on his mobile telephone and informed him that the farmhands located his "number 8" cow.  It was found dead, stuck in the mud somewhere on plaintiffs' property.  Plaintiffs claim that Mr. Simons immediately relayed this information to Trooper Fitzgerald.

Trooper Fitzgerald filed accusatory instruments charging Mr. Simons with insurance fraud in the fourth degree, falsely reporting an incident in the third degree, and making a false punishable written statement, in violation of New York Penal Law Sections 176.15, 240.50(3)(a), and 210.45, respectively.  Plaintiff was arraigned in Town Court and released in his own recognizance.  The judge instructed Trooper Fitzgerald to drive him home.  Upon arriving at plaintiffs' farm, Mr. Simons and Trooper Fitzgerald, along with Mr. Darvoe and another farmhand, were taken to the location of the "number 8" cow.  Trooper Fitzgerald took several photographs of the "number 8" cow, which in fact was mostly white in color.  The cow's identity was confirmed by matching its identification tags with farm records.  Plaintiffs claim that the next day Mr. Simons contacted Senior Investigator Graham to request a dismissal of the charges.  However, Senior Investigator Graham simply told Mr. Simons that he was unaware of the discovery of the "number 8" cow, and that in any event it should be buried.

Some months later, the grand jury declined to indict Mr. Simons.

## III. **DISCUSSION**

### A. **Standards of Review**

### 1. **Summary Judgment**

Summary judgment is granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986); Silver v. City Univ. of New York, 947 F.2d 1021, 1022 (2d Cir. 1991).  The court will not try issues of fact on a motion for summary judgment, rather it will determine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law."  Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997).  In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986);  Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).  In sum, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material

fact and the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

## 2.  Rule 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, the allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998); Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995).  However, factual allegations must be distinguished from "[c]onclusory allegations or legal conclusions masquerading as factual conclusions," as the latter will not be accepted as true.  Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (internal quotation marks omitted).  The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).  In this regard, Federal Rule of Civil Procedure 8(a) provides, in relevant part, "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief, and [ ] a demand for judgment for the relief the pleader seeks."  Fed. R. Civ. P. 8(a).  Thus, the pleading standard is undoubtedly a liberal one.  Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998).  In more definite terms, a plaintiff's complaint will be dismissed for legal insufficiency only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).[6]

---

[6]  Defendants also move to dismiss several claims, or parts thereof, under Rule 12(b)(1) for lack of subject matter jurisdiction.

### B. Sovereign Immunity

Defendants move to dismiss plaintiffs' claims against the State and the State Police on the ground that such claims are barred by the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment's bar on federal suits against "one of the United States" also extends to certain instrumentalities of the states. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S. Ct. 900, 903 (1997).[7] The question whether sovereign immunity extends to a particular instrumentality depends on the nature of the relationship between the instrumentality and the state, which, in turn, depends on the "essential nature and effect of the proceeding against it," as well as the "nature of the entity created by state law." Id. (internal quotation marks omitted). In most cases, if the suit names a state instrumentality but seeks money damages which, if awarded, would be paid by the state, that instrumentality may invoke sovereign immunity. See id. at 430, 117 S. Ct. at 905.

Plaintiff has named the State and the State Police as defendants in this action. There can be no question that the State itself is immune from suit. With respect to the State Police, any money damages awarded to plaintiffs as against that instrumentality would be

---

[7] Sovereign immunity under the Eleventh Amendment is not absolute and can be abrogated by Congress or waived by states. Close v. New York, 125 F.3d 31, 36 (2d Cir. 1997) (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 452-56, 96 S. Ct. 2666, 2669-71 (1976)). However, neither abrogation nor waiver has occurred in this case.

paid by the State.  Therefore, all claims for damages against the State and the State Police are barred by the Eleventh Amendment.  Indeed, plaintiffs concede that neither the State nor the State Police can be sued as "persons" under § 1983.

Plaintiffs also seek injunctive relief from the State and the State Police.  These claims are also barred because plaintiffs have named the State and the State Police instead of a state official.  See Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 32 (2d Cir. 1991) (referencing Ex Parte Young, 209 U.S. 123, 28 S. Ct. 441 (1908)).  Moreover, when plaintiffs previously sought leave to amend the complaint to substitute the State Police Commissioner for the State and the State Police, Magistrate Judge DiBianco found that to grant leave to amend would be futile since plaintiffs did not have standing to seek injunctive relief.  Magistrate Judge DiBianco's findings were adopted by court order dated December 29, 2004.

Therefore, defendants' motion to dismiss plaintiffs' claims against the State and the State Police on the ground that those claims are barred by the Eleventh Amendment will be granted.

### C.  **False Arrest**

Defendants move for summary judgment on plaintiffs' false arrest claim on grounds that they had probable cause to arrest, or, alternatively, are entitled to qualified immunity.

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  The unreasonable seizure of a person in the form of a false arrest is violative of the Fourth Amendment and actionable under § 1983.  The elements of a false arrest claim under § 1983 and the Fourth

Amendment are substantially similar to those of a false arrest claim under New York law.  To

prove the elements of false arrest under New York law, the plaintiff must show that "(1) the

defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement,

(3) the plaintiff did not consent to the confinement, and (4) the confinement was not

otherwise privileged."  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); see Savino

v. City of New York, 331 F.2d 63, 75-76 (2d Cir. 2003); Broughton v. State, 37 N.Y.2d 451,

456-57 (1975).  The existence of probable cause to arrest is a complete defense to a claim

of false arrest; or, in other words, it renders the confinement privileged.  Bernard, 25 F.3d at

102; Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).

### 1.  Probable Cause

Probable cause to arrest exists when the arresting officer has "'knowledge or

reasonably trustworthy information of facts and circumstances that are sufficient to warrant a

person of reasonable caution in the belief that the person to be arrested has committed or is

committing a crime.'"  Escalara v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Weyant,

101 F.3d at 852); see Dunaway v. New York, 442 U.S. 200, 208 n.9, 99 S. Ct. 2248, 2254

n.9 (1979).  The probable cause to arrest inquiry focuses solely on those facts available to

the officer leading up to, and at the time of, the arrest.  Ricciutti v. New York City Transit

Auth., 124 F.3d 123, 128 (2d Cir. 1997) (citing Lowth v. Town of Cheektowaga, 82 F.3d 563,

569 (2d Cir. 1996)).  Facts that become available to the officer after the arrest, whether they

confirm or belie the existence of probable cause, are irrelevant to the inquiry.  Id.  Equally

irrelevant is the arresting officer's state of mind, or subjective motive for making the arrest.

Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588, 593-94 (2004).  Ultimately, the test

is an objective one rooted in the reasonableness requirement of the Fourth Amendment.  Id.

In this case, defendants argue that the undisputed facts show that probable cause to arrest Mr. Simons existed with or without the written statement signed by Mr. Darvoe.  In arguing that probable cause existed without Mr. Darvoe's statement, defendants rely heavily on the following premise:  the dead cow was mostly black and plaintiffs' "number 8" cow was mostly white, therefore Mr. Simons must have known that the dead cow was not his.  However, the undisputed facts show that neither Trooper Fitzgerald nor Investigator Schultz knew <u>at the time of the arrest</u> that the "number 8" cow was mostly white.  Mr. Simons provided the "Individual Cow History Record" to Trooper Fitzgerald on July 17, 2002, which describes plaintiffs' "number 8" cow as "mostly white"; however, both Trooper Fitzgerald and Investigator Schultz admitted during depositions that they had not examined that record before Mr. Simons's arrest the next day.  (<u>See</u> Fitzgerald Dep. 29, Dec. 20, 2005; Schultz Dep. 80-83, Feb. 14, 2006.)  Thus, that information was not "available" to them at the time of the arrest.

Aside from Mr. Darvoe's statement, the only other relevant facts and information known to Trooper Fitzgerald and Investigator Schultz at the time of the arrest were given to them by Mr. Loranger.  In his statement, Mr. Loranger provided details as to the death and disposal of the cow such that one would be reasonable in believing that he was in fact its rightful owner.  However, he did not provide facts or information indicating that Mr. Simons knew the dead cow was not his "number 8" cow, or that he was not missing a cow.  In fact, plaintiff provided Trooper Fitzgerald with documentation related to his "number 8" cow indicating that it did in fact exist.  Mr. Loranger's statement that he did not personally know plaintiff but that his grandparents raised him one summer is irrelevant to the probable cause inquiry.  No reasonable person would believe, based on this information, that the two men

were colluding to commit insurance fraud.[8]  Finally, with respect to Mr. Loranger's vague

statement that he "heard" about past instances in which plaintiff committed insurance fraud,

he did not provide the source or basis for believing such information.  Thus, it cannot be said

that such information was reasonably trustworthy.  Therefore, the undisputed facts show that

without Mr. Darvoe's statement defendants did not have probable cause to arrest Mr.

Simons.

Even with Mr. Darvoe's statement, it cannot be said that the undisputed facts

support a finding of probable cause.  Plaintiffs have submitted evidence tending to show that

Mr. Darvoe's written statement was the product of coercion by Investigator Schultz.  (See,

e.g., Darvoe Aff. Sept. 3, 2002.)  While the text of Mr. Darvoe's written statement alone could

lead a reasonable person to believe that plaintiff committed a crime, a reasonable person

with knowledge that it was the product of coercion would not be warranted in the belief that

Mr. Simons committed a crime.  Thus, the question whether Mr. Darvoe's written statement

gave rise to probable cause to arrest involves genuine issues of material fact.

Moreover, Mr. Simons was arrested at his farm, before Mr. Darvoe signed the

written statement at the police barracks.  In general terms, "whenever a police officer accosts

an individual and restrains his freedom to walk away, he has 'seized' that person."  Terry v.

Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968).  What constitutes an arrest, or seizure,

under the Fourth Amendment depends on the factual circumstances in a given case.  If the

level of intrusion is minimal, the detention for a short period of time, and a reasonable person

would feel free to leave, no arrest has likely occurred.  On the other hand, if the level of

---

[8]  Investigator Schultz testified that he had no evidence to support his theory that Mr. Loranger
and Mr. Simons were colluding to unlawfully obtain insurance money and referred to it as merely "a
suspicion."  (Schultz Dep. 83, Feb. 14, 2006.)

intrusion is great, the detention for a long period of time, and a reasonable person would not feel free to leave, an arrest has likely occurred.

In this case, Investigator Schultz and Trooper Fitzgerald arrived at plaintiffs' farm in separate vehicles.  Investigator Schultz exited his vehicle and immediately confronted Mr. Simons.  Plaintiffs claim that Investigator Schultz got very close to Mr. Simons, with his face only several inches from Mr. Simons face.  He then told plaintiff that he had knowledge that plaintiff knew the dead cow did not belong to him, but rather to Mr. Loranger.  Plaintiffs claim that Investigator Schultz was very emotional, his face red and veins protruding from his neck. He told Mr. Simons that he had to go to the police barracks to discuss the matter further and directed him to get into Trooper Fitzgerald's patrol car.  Investigator Schultz was in plain clothes and driving an unmarked vehicle.  Trooper Fitzgerald was in uniform, armed, and driving a marked police vehicle.  Mr. Simons got into Trooper Fitzgerald's car and was taken to the police barracks.  There he was interrogated before formally being arrested, e.g., Mirandized, handcuffed, fingerprinted, etc.  These facts indicate that Mr. Simons was arrested, or seized, for Fourth Amendment purposes when Investigator Schultz ordered him to get into Trooper Fitzgerald's car and accompany them to the police barracks.  The level of intrusion was fairly great, as he was required to leave his farm in a police vehicle and go to the police barracks for interrogation.  Moreover, a reasonable person in that situation would not believe that he was free to disobey Investigator Schultz's order.  Thus, at the very least questions of fact exist as to whether the arrest occurred prior to the time Mr. Darvoe signed the written statement.

Therefore, defendants' motion for summary judgment on plaintiffs' false arrest claim on the ground that they had probable cause to arrest will be denied.

## 2. **Qualified Immunity**

Even though defendants are not entitled to summary judgment on plaintiffs' false arrest claim based on the existence of probable cause, they may still avoid liability under the qualified immunity doctrine.  Under that doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  In the context of a false arrest claim, an official enjoys qualified immunity if he had "arguable probable cause" to arrest; or, in other words, if either (1) it was objectively reasonable for him to believe probable cause existed, or (2) officers of reasonable competence could disagree as to whether probable cause existed.  Lennon v. Miller, 66 F.3d 416, 423 (2d Cir. 1995).

In this case, at the time of the arrest, Trooper Fitzgerald and Investigator Schultz had facts and information indicating that Mr. Loranger, not plaintiffs, owned the deceased cow.  They did not know that Mr. Simons's missing "number 8" cow was mostly white, nor did they have any other information indicating that he knew the dead cow was not his. Moreover, questions of fact exist with respect to whether Mr. Darvoe's written statement gave rise to probable cause or even arguable probable cause, and also with respect to whether the arrest occurred prior to the time he signed the statement.  Based on the facts and information available at the time of the arrest, it was not objectively reasonable for Trooper Fitzgerald and Investigator Schultz to believe probable cause existed, and officers of reasonable competence could not disagree as to whether probable cause existed.

- 15 -

Therefore, defendants' motion for summary judgment on plaintiffs' false arrest claim on the ground that they are entitled to qualified immunity will be denied.

## D. Malicious Prosecution

Defendants move for summary judgment on plaintiffs' malicious prosecution claim on grounds that they had probable cause to prosecute, or, alternatively, are entitled to qualified immunity.

As stated above, the Fourth Amendment prohibits the unreasonable seizure of persons.  The unreasonable seizure of a person in the form of a malicious prosecution is violative of the Fourth Amendment and actionable under § 1983.  To prove the elements of malicious prosecution under New York law, the plaintiff must show "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor."  Posr v. Court Officer Shield No. 207, 180 F.3d 409, 417 (2d Cir. 1999).[9]  Thus, the existence of probable cause to prosecute is a complete defense to a malicious prosecution claim.  Probable cause to prosecute exists when the officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that the subject could be successfully prosecuted.  See Posr, 180 F.3d at 417.  The probable cause to prosecute inquiry focuses solely on those facts available to the officer leading up to, and at the time of, the arraignment.  Otherwise,

---

[9]  To prove malicious prosecution under § 1983, the plaintiff must also show that there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights."  Rohman v. New York City Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000).  This element is not at issue here.

the probable cause to prosecute inquiry is the same as the probable cause to arrest inquiry, i.e., it is an objective one based on reasonableness.

As discussed above, there was no probable cause to arrest without Mr. Darvoe's statement, and there are genuine issues of material fact as to whether probable cause to arrest existed with Mr. Darvoe's statement and whether the arrest occurred prior to the time he signed the statement.  In between the time Mr. Simons was arrested and arraigned, no additional facts came to light which would have given defendants probable cause to believe that he could be prosecuted successfully.  In fact, plaintiffs claim that Mr. Simons told Trooper Fitzgerald that his "number 8" cow had been discovered on the way to the arraignment.  Thus, for the same reasons discussed above, the undisputed facts do not show that defendants had probable cause or arguable probable cause to prosecute Mr. Simons.

Therefore, defendants' motion for summary judgment on plaintiffs' malicious prosecution claim will be denied.

### E. <u>Substantive Due Process</u>

Defendants move for summary judgment on plaintiffs' substantive due process claim on grounds that the interrogation of Mr. Darvoe was not coercive, entrapment is not a defense in a civil case, and probable cause to arrest and prosecute existed.

The Fourteenth Amendment provides, in relevant part, that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  From this provision has arisen the doctrine of substantive due process, which protects against government conduct that deprives people of protected rights and truly "shocks the conscience" of the court, <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 834,

118 S. Ct. 1708, 1710 (1998) (citing Rochin v. California, 342 U.S. 165, 172-73, 72 S. Ct. 205, 209-10 (1952)), or is "so outrageously arbitrary as to constitute a gross abuse of governmental authority," Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999); see also Lewis, 523 U.S. at 846, 118 S. Ct. at 1716 (substantive due process only protects against "the most egregious official conduct").  However, "[w]here a particular constitutional amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'"  Albright v. Oliver, 510 U.S. 266, 273, 114 S. Ct. 807, 813 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989)); see Bryant v. City of New York, 404 F.3d 128, 135-36 (2d Cir. 2005).

In this case, the government actions which plaintiffs contend was arbitrary and egregious, as well as the harm it allegedly caused, are very closely intertwined with Mr. Simons's arrest and prosecution.  Since the Fourth Amendment provides an explicit textual source of protection against pretrial deprivations of liberty, including false arrest and malicious prosecution, it is the proper guide for analyzing plaintiffs' constitutional claims, not the Fourteenth Amendment.  Therefore, defendants' motion for summary judgment on plaintiffs' substantive due process claim will be granted.

### F.  Abuse of Process

Defendants move to dismiss plaintiffs' abuse of process claims on the ground that they have failed to state a claim upon which relief can be granted.  Specifically, defendants argue that plaintiffs have failed to allege that legal processes were employed by defendants in order to obtain a collateral objective.

The Due Process Clause of the Fourteenth Amendment prohibits, and § 1983 makes actionable, the use of legal processes for wrongful purposes.  As with the other § 1983 "torts," state law claims are very similar and therefore instructive.  To prove the elements of abuse of process under New York law, the plaintiff must show that (1) the defendant employed regularly issued legal process, (2) with intent to do harm without excuse or justification, (3) in order to obtain a collateral objective outside the legitimate ends of the process.  Savino, 331 F.3d at 76.  A collateral objective is more than an improper motive. The focus is on whether the defendant employed legal processes to accomplish a purpose outside of that for which the process was designed.  Examples of collateral objectives are blackmail, extortion, and even retribution.  See Bd. of Educ. of Farmingdale Union Free School Dist. v. Farmingdale Classroom Teachers Ass'n, 38 N.Y.2d 397, 404 (1975).

In this case, plaintiffs allege that defendants employed legal processes "in order to avoid admission of mistake and to protect themselves, their reputation and authority." (Compl. ¶ 57.)  The employment of legal processes against another for the purpose of protecting one's own reputation is certainly outside the legitimate ends of such processes.  In Savino, 331 F.3d 63, the plaintiff alleged that in employing legal processes the defendants were motivated by embarrassment and humiliation, whereas, in this case, plaintiffs allege that defendants' objective was to save their reputations by securing a conviction.  Similar to the examples given in Board of Education of Farmingdale, to employ legal processes in order to save one's reputation is not a purpose for which such processes were designed.  Thus, plaintiffs have sufficiently alleged a collateral objective.

Therefore, defendants' motion to dismiss plaintiffs' abuse of process claims will be denied.

### G.  Supervisory Liability

Defendants move to dismiss and for summary judgment of plaintiffs' supervisory liability claims against Sergeant Hovey and Senior Investigator Graham on the ground that they have failed to allege and cannot show that those individuals were personally involved in the alleged constitutional violations.

"The liability of a supervisor under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003).

In this case, plaintiffs have sufficiently alleged claims of false arrest, malicious prosecution, and abuse of process against Trooper Fitzgerald and Investigator Schultz. Plaintiffs have alleged that Sergeant Hovey and Senior Investigator Graham, as supervisors of Trooper Fitzgerald and Investigator Schultz, knew or should have known of their alleged constitutional violations.  Plaintiffs have alleged that Sergeant Hovey and Senior Investigator Graham failed to properly train, supervise, and reprimand or discipline Trooper Fitzgerald and Investigator Schultz.  Plaintiffs have also asserted various allegations referring to defendants collectively which, although not specifically directed at Sergeant Hovey and Senior Investigator Graham, bolster their claim of supervisory liability.  Taken together, these

allegations are sufficient to state a claim for supervisory liability against Sergeant Hovey and Senior Investigator Graham.

Moreover, genuine issues of material fact exist with respect to the extent to which the supervisors knew of Investigator Schultz's previous indiscretions and his emotional and behavioral problems,[10] how Senior Investigator Graham responded after learning that the "number 8" cow had been discovered, and the extent to which Sergeant Hovey was aware of Investigator Schultz's allegedly coercive interrogation of Mr. Darvoe.

Therefore, defendants' motions to dismiss and for summary judgment on plaintiffs' supervisory liability claims against Sergeant Hovey and Senior Investigator Graham will be denied.

### H.  Defamation

Defendants move to dismiss plaintiffs' defamation claim on grounds that pendent jurisdiction should not be exercised, or, alternatively, plaintiffs have failed to state a claim upon which relief can be granted.

District courts have supplemental jurisdiction over all claims that are so related to federal claims over which they exercise original jurisdiction that they form part of the same case or controversy under Article III of the Constitution.  28 U.S.C. § 1367(a).  However, district courts may decline to exercise supplemental jurisdiction over a state law claim if (1) it raises a novel or complex state law issue, (2) it substantially predominates over the federal claims, (3) all federal claims have been dismissed, or (4) in exceptional circumstances, another compelling reason to do so exists.  Id. § 1367(c).

---

[10] Plaintiffs have submitted evidence indicating that indiscretions occurred and problems existed before the events in this matter took place.

In this case, plaintiffs' defamation claim does not raise a novel or complex state law issue, nor does it substantially predominate over the federal constitutional claims.  Moreover, all but one of plaintiffs' federal claims will survive the present motion, and no exceptional circumstances or other compelling reasons for declining jurisdiction exist.  Finally, the defamation claim arises out of and involves the same facts and circumstances as the other claims such that judicial economy favors the exercise of supplemental jurisdiction.  Therefore, defendants' motion to dismiss plaintiffs' defamation claim on the ground that supplemental jurisdiction should not be exercised will be denied.

To state a claim for defamation under New York law, a plaintiff must allege (1) a false and defamatory statement of fact, (2) "of and concerning" the plaintiff, (3) the publication of the statements to a third party, and (4) injury to the plaintiff.  Excellus Health Plan, Inc. v. Tran, 287 F. Supp. 2d 167, 173-74 (W.D.N.Y. 2003); Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61 (2d Cir. 1993).  While the Second Circuit has abandoned the stringent in haec verba standard in defamation cases, to comply with the dictates of Rule 8(a) a plaintiff must still "afford defendant sufficient notice of the communications complained of to enable him to defend himself."  Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986) (internal quotation marks omitted).

In this case, plaintiffs have alleged the following in support of their defamation claim: defendants told the media that Mr. Simons "had been charged with crimes, lied, and committed crimes" (Compl. ¶ 72); Investigator Schultz publicly stated that Mr. Simons was responsible for the "tortured cow"; defendants told plaintiffs' insurance agent that they "intend[ed] to challenge his honesty and trustworthiness" (Compl. ¶ 73); and defendants published criminal charges against Mr. Simons.  Plaintiffs have failed to demonstrate or even

allege falsity with respect to some of these statements.  For example, it is undisputed that Mr. Simons was in fact charged with crimes, and that defendants intended to and did challenge his honesty and trustworthiness.  Therefore, part of the statements made to the media, the statements made to plaintiffs' insurance agent, and the criminal charges themselves cannot support a claim for defamation.  With respect to the alleged statements to the media that Mr. Simons lied and committed crimes, as well as Investigator Schultz's alleged statements that he was responsible for the tortured cow, plaintiffs have failed to meet the requirements set forth in Rule 8(a).  With respect to the alleged statements to the media, plaintiffs have not identified the speaker or provided the specific content of the statement.  Moreover, with respect to Investigator Schultz's alleged statements, plaintiffs have failed to provide the specific content and context of the statement.  Plaintiffs allegations have simply failed to "afford defendant[s] sufficient notice of the communications complained of to enable [them] to defend [themselves]."  Kelly, 806 F.2d at 46.

Therefore, defendants' motion to dismiss plaintiffs' defamation claim on the ground that they have failed to state a claim will be granted.

## I. Loss of Consortium

Finally, defendants move to dismiss plaintiffs' loss of consortium claim on the ground that it is a derivative claim subject to dismissal if the other claims are dismissed.

For the reasons set forth above, not all of plaintiffs' other claims will be dismissed.  Moreover, plaintiffs have sufficiently stated a claim for loss of consortium and raised genuine issues of material fact with respect to that claim.  Therefore, defendants' motion to dismiss plaintiffs' loss of consortium claim will be denied.

## V. **CONCLUSION**

For the reasons discussed above, defendants' motion for summary judgment and to dismiss will be denied with respect to plaintiffs' false arrest, malicious prosecution, abuse of process, supervisory liability, and loss of consortium claims. Defendants' motion will be granted with respect to plaintiffs' substantive due process and defamation claims, as well as all claims against the State and the State Police.

Accordingly, it is

ORDERED that:

1. Defendants' motion for summary judgment and to dismiss is GRANTED in part and DENIED in part;

2. Plaintiffs' substantive due process and defamation claims (third and seventh causes of action, respectively) are DISMISSED;

3. Plaintiffs' claims against the State of New York and the New York State Police are DISMISSED; and

4. Defendants' motion for summary judgment and to dismiss all other claims (first, second, fourth, fifth, sixth, and eighth causes of action) is DENIED.

IT IS SO ORDERED.

United States District Judge

Dated:  January 31, 2007
        Utica, New York.